IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. **3:24-cr-44-FDW** |
| ) | |
| v. ) | **BILL OF INDICTMENT** |
| ) | |
| (1) ANTOINE JOHNSON and ) | Violations: 18 U.S.C. § 1014 |
| (2) KIMBERLY MADDOX ) | 18 U.S.C. § 1349 |
| | 18 U.S.C. § 2 |

### THE GRAND JURY CHARGES:

At all relevant times:

### Introduction

1. Between 2018 through 2023, Defendants ANTOINE JOHNSON ("JOHNSON") and KIMBERLY MADDOX ("MADDOX") executed a scheme to fraudulently obtain approximately $2 million in lines of credit, bank loans, and COVID-19 pandemic relief funds on behalf of their business by submitting false information, including false financial information and fake employment data, in support of their applications.

### Defendants and Their Related Entity

2. JOHNSON and MADDOX were married and residents of Huntersville, North Carolina, within the Western District of North Carolina.

3. Pick Up and Go Moving International, Inc., also known as, Pickup & Go Moving International, Inc., Pickup And Go Moving International, Inc., Pick Up And Go Moving International, Inc., and Pick Up & Go Moving International, Inc. (collectively referred to as "PUGMI") was registered in North Carolina, with a business address in Huntersville, North Carolina. JOHNSON was the president and MADDOX was the vice-president; both were co-owners of PUGMI.

4. JOHNSON and MADDOX maintained a business bank account at Charlotte Metro Credit Union ending in x8290 on behalf of PUGMI (the "CMCU Account").

### Victim Financial Institutions

5. Cross River Bank and Pinnacle ("Victim Banks") were financial institutions, the accounts and deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

6. Allegacy Federal Credit Union, Charlotte Metro Credit Union, and Langley Federal Credit Union ("Victim Credit Unions") were financial institutions, the accounts and

1

deposits of which were insured by the National Credit Union Administration Share Insurance Fund.

7.  The Victim Banks and Victim Credit Unions (hereinafter the "Victim Financial Institutions") were financial institutions as defined in Title 18, United States Code, Section 20. The Victim Financial Institutions required, and relied upon, truthful information from applicants seeking loans and credit lines, including providing truthful information about each applicant's business, employment, income, taxes, and other financial information.

## The Paycheck Protection Program

8.  The Paycheck Protection Program ("PPP") was a COVID-19 pandemic relief program administered by the United States Small Business Administration ("SBA") that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating SBA approved lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

9.  To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was required to provide documentation showing its payroll expenses, such as filed federal income tax documents. The business must have existed in an operational condition on or before February 15, 2020.

## The Economic Injury Disaster Loan Program

10. The Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act) was a federal law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

11. The provisions of the CARES Act, in conjunction with an officially declared disaster by the United States Government, allowed the SBA to offer Economic Injury Disaster Loan ("EIDL") funding to business owners negatively affected by COVID-19. Through the SBA online portal, EIDL applicants could submit personal and business information in support of an EIDL application.

12. An EIDL application included a paragraph where the applicant affirmed that the information submitted was true and correct under the penalty of perjury and other applicable criminal statutes. The application process involved filling out data fields relating to the size of the affected business entity, the ownership of the business, the number of employees, and gross

revenues realized in the 12 months prior to COVID-19's impact on the national economy. The business must have existed in an operational condition on or before January 31, 2020.

13. The EIDL application information, electronically submitted by the applicant, was then used by SBA systems to calculate the amount of money the business was eligible to receive in the form of a loan. The SBA Office of Disaster Assistance, an executive branch agency, had authority over all loans created and disbursed under the EIDL program. EIDLs were solely funded by the SBA and disbursed from government-controlled accounts maintained with the U.S. Treasury at Federal Reserve Banks throughout the United States.

### The Fraud Scheme and Conspiracy

14. Between November 2018 and November 2023, JOHNSON and MADDOX fraudulently sought and obtained lines of credit and business loans from the Victim Financial Institutions in the name of PUGMI by making false and fraudulent statements.

15. When seeking such loans and lines of credit, JOHNSON and MADDOX made material misrepresentations to the Victim Financial Institutions, upon which the banks relied, to induce them to approve and fund those loans and lines of credit.

16. The fraudulent statements submitted to the Victim Financial Institutions varied amongst the different loans requested, but included, among others:
    a. Misrepresentations about income;
    b. False employment information; and
    c. False information about the finances of the borrowers and their business, including the submission of false tax returns and false financial statements.

17. After relying on the fraudulent loan information, the Victim Financial Institutions approved and funded the loans and lines of credit. As part of the conspiracy and scheme to defraud, JOHNSON and MADDOX obtained and attempted to obtain more than 30 loans, totaling approximately $2 million, from approximately five financial institutions. For example:

    a. On or about June 9, 2020, a loan application was submitted to Pinnacle with a falsified 2017 PUGMI tax record, and represented that PUGMI had an annual sales revenue of $5.4 million. On or about August 27, 2020, JOHNSON and MADDOX signed a bank note for a PUGMI loan in the amount of $306,414.48, which was subsequently funded by Pinnacle.

18. After JOHNSON and MADDOX obtained the proceeds from the fraudulent loans, they defaulted on many of the loans, causing financial losses to the Victim Financial Institutions.

3

## The PPP and EIDL Fraud Scheme

19. Between April 2020 and February 2022, JOHNNSON and MADDOX, submitted and caused to be submitted false and fraudulent PPP loan and EIDL applications in the name of their business to the SBA and its third-party participating lenders in an attempt to obtain funds. As a result of the fraudulent loan applications, JOHNSON and MADDOX obtained at least $400,000 in loan proceeds.

20. It was part of the scheme that JOHNSON and MADDOX knowingly submitted, and caused to be submitted, PPP loan and EIDL applications and supporting documents on behalf of PUGMI that contained materially false statements and misrepresentations regarding PUGMI's income, gross revenues, expenses, and number of employees, and caused those fraudulently obtained relief funds to be disbursed to the CMCU Account as set forth below.

*PPP Loan Application x7907*

21. On or about June 24, 2020, MADDOX submitted and caused to be submitted an electronic application to Cross River Bank in the name of Pick Up and Go Moving International Inc ("PPP Loan Application x7907").

22. PPP Loan Application x7907 falsely represented that the business had an average monthly payroll of $51,235.10; had 10 employees; and that the purpose of the loan was for payroll. In addition, as part of the application, MADDOX provided a false IRS Form W3 signed by MADDOX as CEO purporting to show that, in 2019, the business made $587,884 in payments to employees. In fact, no such Form was ever filed with the Internal Revenue Service on behalf of the business.

23. On or about June 24, 2020, MADDOX signed, and caused to be signed, a Cross River Bank promissory note, which attested: "I further certify that the information provided in the application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3751; and, if submitted to a federally insured institution under, 18 USC 1014[.]"

24. On or about June 25, 2020, Cross River Bank funded the loan by wiring $128,087 to the CMCU Account.

25. In or around January 2021, JOHNSON contacted Cross River Bank's processor, Kabbage, via telephone to inquire about obtaining additional PPP funds.

26. In furtherance of that effort, between January 2021 and February 2021, JOHNSON and MADDOX made false statements and fraudulent representations about the business to Kabbage. For example:

4

a. On or about February 2, 2021, false 2019 PUGMI federal tax records were provided.
   b. On or about February 11, 2021, a false payroll spreadsheet was provided.
   c. On or about February 11, 2021, during a recorded call, JOHNSON falsely represented that the business had a lease agreement.
   d. On or about February 25, 2021, during a recorded telephone call, JOHNSON falsely stated that the business had a physical office, when in truth, the address provided was a United Parcel Service store location, and MADDOX confirmed falsely that the business address provided by JOHNSON was their office address and that the business had a respective lease agreement.

27. On or about March 24, 2021, Cross River Bank provided additional PPP loan funds in the amount of $122,475, which was wired to the CMCU Account.

*EIDL Application x8002*

28. On or about April 10, 2020, MADDOX submitted and caused to be submitted an application through SBA's electronic portal in the name of Pick Up & Go Moving International, Inc. ("EIDL Application x8002").

29. EIDL Application x8002 falsely represented that the business had $1.8 million in gross revenue for the 12 months prior to the date of the disaster and had 21 employees.

30. On or about July 2, 2020, MADDOX electronically signed the Loan Authorization and Agreement in connection with EIDL Application x8002 for the business. In the loan agreement, MADDOX certified that all the representations in EIDL Application x8002 were true, correct and complete and were offered to induce SBA to make the loan.

31. On or about July 2, 2020, SBA funded the loan by wiring approximately $149,900 to the CMCU Account.

## COUNT ONE
(Conspiracy to Commit Bank Fraud and Wire Fraud)

32. The Grand Jury realleges and incorporates by reference herein, all of the allegations contained in paragraphs 1 through 31 of the Bill of Indictment, and further alleges that:

33. From in or around 2018 through in or around 2023, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) ANTOINE JOHNSON and
(2) KIMBERLY MADDOX**

did knowingly combine, conspire, confederate, and agree with one another to commit offenses against the United States, those being bank fraud, in violation of Title 18, United States Code, Section 1344; and wire fraud in violation of Title 18, United States Code, Section 1343.

### *Objects of the Conspiracy*

34. Bank Fraud: It was a part and an object of the conspiracy that the named Defendants, would and did execute and attempt to execute the scheme and artifice to obtain monies owned by, or in the custody or control of, one or more Victim Financial Institutions, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344(2).

35. Wire Fraud: it was a part and an object of the conspiracy that the named Defendants, with the intent to defraud, did knowingly and intentionally devise the above-described scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communication in interstate commerce any writing, signal, picture, and sound, to wit, electronic loan applications, wire transfers, and other electronic financial transactions in interstate commerce, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
(False Statements to a Financial Institution)

36. The Grand Jury realleges and incorporates by reference herein, all of the allegations contained in paragraphs 1 through 27 of the Bill of Indictment, and further alleges that:

37. On or about February 25, 2021, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

**(1) ANTOINE JOHNSON**

did knowingly make and cause to be made a false statement with the intent to influence the actions of Cross River Bank, a financial institution, the accounts of which are insured by the National Credit Union Administration Share Insurance Fund, to wit, in PPP Loan Application x7907, JOHNSON, among other things, falsely represented that the business had a physical office space and a lease agreement.

All in violation of Title 18, United States Code, Section 1014 and 2.

## COUNT THREE
(False Statements to a Financial Institution)

38. The Grand Jury realleges and incorporates by reference herein, all of the allegations contained in paragraphs 1 through 27 of the Bill of Indictment, and further alleges that:

39. On or about February 25, 2021, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

### (2) KIMBERLY MADDOX

did knowingly make and cause to be made a false statement with the intent to influence the actions of Cross River Bank, a financial institution, the accounts of which are insured by the National Credit Union Administration Share Insurance Fund, to wit, in PPP Loan Application x7907, MADDOX falsely represented, among other things, that the business had a lease agreement for a physical office space.

All in violation of Title 18, United States Code, Section 1014 and 2.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offense for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981, and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) and (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant's to the extent of the value of the property described in (a).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

a. A forfeiture money judgment in the amount of at least $2 million, such amount constituting the proceeds of the violations set forth in this Bill of Indictment.

A TRUE BILL:

_____
FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

_____
CASSYE COLE
ASSISTANT UNITED STATES ATTORNEY